613 F.2d 696
 21 Fair Empl.Prac.Cas. 1179,
21 Empl. Prac. Dec. P 30,553
Theresa KIRBY, Special Administratrix, Grathey Nelson and
Lemuel Mims, Appellants,
v.
COLONY FURNITURE COMPANY, INC., Appellee.
 No. 78-1808.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 15, 1979.
Decided Jan. 9, 1980.
 
 John M. Bilheimer, Kaplan, Brewer, Bilheimer & Marks, Little Rock, Ark., for appellants; John W. Walker, Little Rock, Ark., on brief.
 William S. Mitchell, Jr., Mitchell & Lowry, Little Rock, Ark., for appellee.
 Before GIBSON,* Chief Judge, ROSS and McMILLIAN, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 Appellants William Kirby,[1] Grathey Nelson and Lemuel Mims, on behalf of themselves and the class they represent, appeal from the judgment of the district court on their Title VII employment discrimination claim. For reversal appellants argue that the trial court erred (1) in refusing to certify the class of black employees at Colony Furniture Co. (Colony) for the purposes of monetary relief as well as injunctive relief and (2) in failing to find classwide racial discrimination in Colony's promotional policies, Colony's use of the "leadman" classification and Colony's layoff policies. Appellants also argue that should classwide relief not be appropriate in any of the above instances, they are entitled to individual monetary relief for the above acts of discrimination they personally have suffered. For the following reasons, we affirm in part and reverse in part.
 
 
 2
 William Kirby, now deceased, was a black employee at Colony Furniture Company's "top plant" beginning in March, 1967. Kirby filed his complaint on January 30, 1973, seeking to represent "the class of black persons who are employed, have been employed, have sought and might seek employment by the defendant Colony Furniture Company," and alleging companywide racially discriminatory hiring, job assignment, payment and layoff policies. Two additional black employees, Grathey Nelson and Lemuel Mims, were granted leave to intervene as parties plaintiff.
 
 
 3
 Appellee, Colony Furniture Company, has been in existence since 1953 and employs about 200 persons. It is divided into ten departments, one of which is the "top plant," which manufactures and attaches the tops of furniture. Kirby, Nelson and Mims work at the top plant but their charges of racial discrimination are companywide.
 
 
 4
 After a two-day bench trial, the district court certified the class as to injunctive relief but not as to monetary relief. The district court awarded classwide injunctive relief on one issue only. Finding that the hiring practices for truck drivers resulted in discrimination in fact, though not in intent, the court ordered appellee to take certain specified steps to end the discrimination. Although the court refused to certify the class as to monetary relief, it awarded the individual plaintiffs, Kirby, Nelson and Mims, monetary relief for Colony's failure to give them the customary ten cent per hour raise at the end of their initial probationary period and for instances when, on the basis of race, specified white employees were promoted and paid more than plaintiffs.
 
 
 5
 Appellants' first contention of error is well taken; there was no reason for the district court to refuse to certify the class as to monetary relief. The law is well settled that classwide back pay should be denied only in extraordinary circumstances. Albemarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Wells v. Meyer's Bakery, 561 F.2d 1268, 1272 (8th Cir. 1977); Stewart v. General Motors Corp., 542 F.2d 445, 451-53 (7th Cir. 1976), Cert. denied, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977); Cf. Rogers v. International Paper Co., 526 F.2d 722, 723 (8th Cir. 1975); Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 257 (5th Cir. 1974); Head v. Timken Roller Bearing Co., 486 F.2d 870, 876 (6th Cir. 1973); Robinson v. Lorillard Corp., 444 F.2d 791, 802 (4th Cir.), Cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). The special factors which justify not giving an award of classwide back pay have been narrowly construed and the fact that computation of the award will be difficult has been specifically rejected as an adequate "special factor." Stewart v. General Motors Corp., supra, 542 F.2d at 451, Citing Albemarle Paper Co. v. Moody, supra, 422 U.S. at 417, 95 S.Ct. 2362; United States v. United States Steel Corp., 520 F.2d 1043, 1050 (5th Cir. 1975), Cert. denied, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); Cf. Robinson v. Lorillard Corp., supra, 444 F.2d at 802 n.14. Therefore the court's sole rationale, that "the varieties of employees involved and the variety of factual considerations" prohibited classwide back pay, is clearly insufficient and classwide back pay is available as a remedy in this case.
 
 
 6
 The next question is what discriminatory practices, if any, were conducted on a classwide basis so as to warrant back pay awards for class members.
 
 
 7
 The district court awarded the named plaintiffs, Kirby, Nelson and Mims, damages for Colony's failure to pay plaintiffs the customary ten cent per hour raise at the end of their ninety-day probationary period. It is unclear whether the district court refused to award other members of the class the same award because the class members did not suffer the same discrimination or because the court assumed classwide monetary relief was inappropriate. We therefore remand for a determination as to whether Colony discriminated on a classwide basis in its payment of the postprobationary period raise. If classwide discrimination did occur, the court should award classwide monetary relief on this basis.
 
 
 8
 Appellants have argued that there are three additional bases upon which classwide monetary relief should be awarded. According to appellants, appellee's promotional policies, its use of the "leadman" classification and its layoff policies all resulted in racial discrimination. The district court dismissed these allegations of classwide racial discrimination. We find that the district court erred in holding that appellee's promotional policies and use of the leadman classification were not discriminatory on a classwide basis. There is nothing in the record, however, to indicate that appellee's layoff policies were racially discriminatory on a classwide basis.
 
 
 9
 Appellee's promotional policies appear to have resulted in discrimination against the black employees. The production force at appellee's plant is approximately 80% Black and 20% White. Appellee's preferred policy is to promote its own people from within the plant to supervisory jobs, rather than hire from outside. However, there are 27% Blacks (6 of 22 employees) and 73% Whites in the supervisory positions.[2] In addition, the six blacks who are in supervisory positions have more tenure than the white supervisors[3] and are paid less.[4] Statistical evidence such as this constitutes a prima facie case of racial discrimination. E. g., Teamsters v. United States, 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); Stewart v. General Motors Corp., supra, 542 F.2d at 449; Rowe v. General Motors Corp., 457 F.2d 348, 358 (5th Cir. 1972). Appellee offered very little evidence to rebut this prima facie case. In its brief, appellee merely discussed the interpersonal skills a supervisor must have and pointed to one employee's opinion, given at trial, that there were no blacks in the plant qualified to run the plant. No other significant rebuttal evidence was offered. This scarcely addresses the serious pattern of discrimination indicated by the above statistics.
 
 
 10
 Moreover, as far as we can determine, the trial court addressed only one of the points made in appellants' argument, the unequal pay problem. The court concluded that there was no proof that blacks were paid less than whites In the same position (emphasis added). Appellants' argument was not, however, that blacks were paid less than whites in the same position, but that blacks were concentrated in the lower paying jobs. Of the six black management employees, only one earned more than $140 per week, which was at the bottom of the management salary scale. Of the sixteen white management employees, eleven earned more than $140 per week.
 
 
 11
 On the basis of this prima facie case made by appellants and appellee's inadequate rebuttal, we conclude that Colony's promotional policies discriminated against the class represented by appellants. Therefore, the class, including appellants, is entitled to classwide monetary relief for lost promotional opportunities. It also appears that injunctive relief to correct this discrimination is appropriate. However, the record is not sufficient for us to determine what form this relief should take. We therefore leave the formulation of injunctive relief to the district court. On remand the district court must also determine whether leadmen are supervisory employees. See note 2 Supra. If leadmen are supervisory employees, the district court should include those positions when fashioning appropriate classwide injunctive and monetary relief for promotional discrimination. If leadmen are not supervisory employees, classwide injunctive and monetary relief may nonetheless be appropriate in view of appellants' attack upon the leadman classification. See discussion Infra.
 
 
 12
 Appellants' next claim of classwide discrimination is closely related to the first. Appellants argue that appellee's use of the leadman classification is racially discriminatory. As discussed above, appellants' statistical evidence strongly suggested that appellee's use of the leadman classification process produces a disproportionate number of white leadmen. Approximately 60% Of the higher paid leadmen positions are held by white employees, although the workforce from which leadmen are generally chosen is 80% Black. According to appellants, although classified as a management position by appellee, a leadman does not exercise supervisory responsibilities. Appellants argue that in fact the leadman classification enables appellee to pay white employees more than black employees for comparable work. The evidence in the record about the supervisory nature of the leadman position was highly contradictory. Even appellants recognize that, at some times, leadmen evidently did exercise supervisory responsibility although at other times they did not. See Brief for Appellants at 22.
 
 
 13
 The district court rejected appellants' challenge to the leadman classification on the ground that "(t)he Court . . . finds nothing to indicate that the looseness of such a classification system was created by the defendant (or, indeed, the union) for the purpose of creating the possibility of such differential treatment." Appellants argue, based on the above language, that the district court improperly demanded a showing of bad faith before it would strike down the leadman classification.
 
 
 14
 For the reasons discussed below, we conclude that the district court used the improper standard of proof and remand for further proceedings consistent with this opinion. Under our analysis, it is not necessary that we accept appellants' characterization of the district court's memorandum opinion. As noted above, appellants argue the district court improperly required a showing of bad faith. Bad faith is not necessarily an issue under Title VII. See Albemarle Paper Co. v. Moody, supra, 422 U.S. at 422-23, 95 S.Ct. 2362; Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). However, "(p)roof of discriminatory motive is critical" to strike down an employment practice challenged under a disparate Treatment theory, but such "(p)roof of discriminatory motive . . . is not required under a disparate-Impact theory." Teamsters v. United States, supra, 431 U.S. at 335-36 n.15, 97 S.Ct. at 1554-55 n.15; (emphasis added); Compare McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (disparate treatment), With Griggs v. Duke Power Co., supra, 401 U.S. at 430-32, 91 S.Ct. 849 (disparate impact). See generally Blumrosen, Strangers in Paradise : Griggs v. Duke Power Co. and the Concept of Employment Discrimination, 71 Mich.L.Rev. 59 (1972). Either the disparate treatment or disparate impact theory can be applied to the particular facts in the present case. See Teamsters v. United States, supra, 431 U.S. at 335-36 n.15, 97 S.Ct. 1843; Wright v. National Archives & Records Serv., 609 F.2d 702, 710 (4th Cir. 1979) (en banc) (characterizes disparate treatment and disparate impact theories as alternative grounds for relief). Thus, even construing the district court's word "purpose" as the equivalent of either "intent" or "motive" as used in recent Supreme Court cases, E. g., Furnco Construction Co. v. Waters, 438 U.S. 567, 580, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (discriminatory "animus"); Teamsters v. United States, supra, 431 U.S. at 335-36 n.15, 97 S.Ct. 1843 (discriminatory "motive"), we conclude the district court erred.
 
 
 15
 In view of the not inconsiderable difficulties associated with the application of the two different ways of establishing a Title VII violation, we take this opportunity to clarify our understanding of the "order and allocation of proof." McDonnell Douglas Corp. v. Green, supra, 411 U.S. at 800, 93 S.Ct. 1817. Such a course is not without difficulty in itself, but we shall try to avoid any semantic "potholes." (See Board of Trustees v. Sweeney, 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam), Vacating and remanding 569 F.2d 169 (1st Cir.).
 
 
 16
 As noted above, proof of discriminatory motive is critical in a disparate treatment case. Teamsters v. United States, supra, 431 U.S. at 335 n.15, 97 S.Ct. 1843. By making a prima facie showing of disparate treatment, Title VII plaintiffs raise an inference of "discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible (I. e., racial) considerations." Furnco Construction Co. v. Waters, supra, 438 U.S. at 579-80, 98 S.Ct. at 2951. However, a "prima facie showing is not the equivalent of a factual finding of discrimination . . . ." Id. at 579, 98 S.Ct. at 2951. That is, the employer as a Title VII defendant does not have to prove absence of discriminatory motive to escape liability; a prima facie showing of disparate treatment shifts only the burden of producing evidence to the employer, not the burden of persuasion. See Board of Trustees v. Sweeney, supra, 439 U.S. at 25, 99 S.Ct. 295; Id. at 29, 99 S.Ct. 295 (Stevens, J., dissenting). As stated in Furnco,
 
 
 17
 the burden which shifts to the employer is merely that of proving that he based his employment decision on a legitimate consideration, and not an illegitimate one such as race. . . . To dispel the adverse inference from a prima facie showing (of disparate treatment), the employer need only "articulate some legitimate, nondiscriminatory reason for the employee's (treatment)."
 
 
 18
 438 U.S. at 577-78, 98 S.Ct. at 2950, Citing McDonnell Douglas Corp. v. Green, supra, 411 U.S. at 802, 93 S.Ct. 1817. "(P)roof of a justification which is reasonably related to the achievement of some legitimate goal (does not) necessarily (end) the inquiry. The plaintiff must be given the opportunity to introduce evidence that the proffered justification is merely a pretext for discrimination." Furnco Construction Co. v. Waters, supra, 438 U.S. at 578, 98 S.Ct. at 2950; McDonnell Douglas Corp. v. Green, supra, 411 U.S. at 804-05, 93 S.Ct. 1817.
 
 
 19
 In summary, in a disparate treatment case the Title VII plaintiff must show "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.' " Furnco Construction Co. v. Waters, supra, 438 U.S. at 576, 98 S.Ct. at 2949, Citing Teamsters v. United States, supra, 431 U.S. at 358, 97 S.Ct. 1843. The Title VII defendant can then rebut the inference of discriminatory intent by articulating a legitimate, nondiscriminatory basis for the challenged action. The plaintiff may then show that the articulated justification is merely a pretext for discrimination. See, e. g., McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 282 & n.10, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). The burden of persuasion remains on the plaintiff; the plaintiff must convince the trier of fact by a preponderance of the evidence that the challenged employment practice is discriminatory.
 
 
 20
 In comparison, proof of discriminatory intent is not required under a disparate impact theory. In such a case
 
 
 21
 the Title VII claim is that a facially neutral employment practice actually falls more harshly on one racial group, thus having a disparate impact on that group . . . . As set out by the Court in Griggs v. Duke Power Co., Supra, to establish a prima facie case on a disparate impact claim, a plaintiff need not show that the employer had a discriminatory intent but need only demonstrate that a particular practice in actuality "operates to exclude Negroes." Once the plaintiff has established the disparate impact of the practice, the burden shifts to the employer to show that the practice has a "manifest relationship to the employment in question." The "touchstone is business necessity" and the practice "must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge."
 
 
 22
 Furnco Construction Co. v. Waters, supra, 438 U.S. at 583, 98 S.Ct. at 2952-53 (Marshall, J., dissenting) (citations omitted); See, e. g., United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 308 (8th Cir. 1972) (en banc), Cert. denied, 409 U.S. 1107, 93 S.Ct. 900, 34 L.Ed. 687 (1973). If the employer then meets the burden of proving that its challenged employment practice is justified by business necessity, the plaintiff may then show that other employment practices, which lack a similarly discriminatory effect, would satisfy "the employer's legitimate interest in 'efficient and trustworthy workmanship.' " Albemarle Paper Co. v. Moody, supra, 422 U.S. at 425, 95 S.Ct. at 2375, Citing McDonnell Douglas Corp. v. Green, supra, 411 U.S. at 802, 93 S.Ct. 1817; Cf. Dothard v. Rawlinson, 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (sex discrimination).
 
 
 23
 Thus, an employment practice which has a disparate impact upon a group protected under Title VII is invalid unless the employer can prove the challenged practice is justified by business necessity. In other words, under a disparate impact theory, a prima facie showing shifts the burden of producing evidence to the employer. The burden of proof[5] is upon the employer to establish business necessity. See Griggs v. Duke Power Co., supra, 401 U.S. at 432, 91 S.Ct. 849; Rice v. City of St. Louis, 607 F.2d 791 (8th Cir. 1979); Green v. Missouri Pacific RR, 523 F.2d 1290, 1293 (8th Cir. 1975) (citation of cases).
 
 
 24
 In the present case the district court properly required proof of discriminatory motive under appellants' disparate Treatment challenge of the leadman classification. Appellants failed to show that the supervisory responsibility articulated by appellee as a "legitimate, nondiscriminatory reason" for the difference in treatment was merely a pretext for discrimination. However, to the extent that appellants attacked the leadman classification under a disparate Impact theory, that is, as a facially neutral employment practice that falls more harshly upon one racial group, the district court improperly required appellants to prove the leadman position was not supervisory. On remand the burden of proof should be upon the employer to show that the leadman classification is justified by business necessity.
 
 
 25
 We therefore remand to the district court to determine whether appellee's use of the leadman classification can be justified by business necessity. If so, the trial court may then determine whether the selection process was also justified by business necessity under the disparate impact theory. Of course, if the trial court determines that leadmen are supervisory employees, appellee will have established the business necessity justification for the job classification. However, as supervisory employees, leadmen will then fall within the scope of the remedy for promotional discrimination discussed above. If leadmen are not supervisory employees, the trial court must then determine whether the intermediate classification and selection procedure was justified by business necessity.
 
 
 26
 While we reverse in part and remand the district court's determination as to classwide discrimination, we affirm its conclusion that the leadman classification did not result in racial discrimination in the instance cited by appellant Kirby concerning employee Johnson. Kirby alleged that Neal Johnson, a white employee hired after Kirby, was classified as a leadman and, on the basis of that classification, was paid more than Kirby for doing the same work. The district court found that the classification of Johnson as a leadman did not have the racially discriminatory Result claimed by Kirby. The record supports this conclusion. Kirby's individual claim of racially discriminatory use of the leadman classification is based on his theory that a leadman is selected for the purpose of exercising supervisory responsibilities. According to Kirby, because Johnson did not exercise any supervisory responsibilities, the leadman classification was manipulated by appellee for racial reasons.
 
 
 27
 There are two problems with appellant Kirby's argument. First, we disagree that the fact that Johnson did not exercise supervisory duties proves, by itself, that the leadman classification was being manipulated. There is nothing in the record to indicate that the Only basis for the leadman classification is the exercise of supervisory responsibilities. Secondly, Johnson possessed special skills; he was concededly skilled in operating the electronic glue spreader, a piece of machinery crucial to the top plant's operations. Colony had recently purchased a second-hand Italian electronic glue spreader. None of the employees at Colony, including Kirby, knew how to operate this new machine. Raymond Bethard, supervisor of the top plant, hired one individual skilled in running this glue spreader but this operator quit after two weeks. Colony's owner then pressured Bethard to find someone else who could operate the machine and get it back into operation. Bethard then hired Johnson away from another furniture company, the Owasso Manufacturing Co. in nearby Benton. Thus, the district court's conclusion that Johnson's special skills warranted his classification as a leadman and the concomitant increase in pay is reasonable and supported by the record.
 
 
 28
 The last basis on which appellants argue classwide monetary relief should have been granted is as compensation for appellee's racially discriminatory layoff policies. Appellants' proof simply does not support a finding of classwide discrimination in layoffs. Appellants base their entire class discrimination claim on one instance in which Rupert Stone, a white employee with less seniority, was laid off for a shorter length of time than Kirby or Nelson. The district court found that Stone's shorter layoff was mandated by "routine business considerations,"[6] specifically the fact that Stone was the tenon machine off-bearer, a job which continued during plant shutdowns. Unlike their case regarding promotional opportunities, appellants have introduced no statistics showing the number of black employees laid off, the number of white employees laid off, or the respective length of layoffs for each. Without information which even hints as to how the entire class was affected by appellee's layoff policies, it is impossible for this court to find that the district court erroneously determined that there was no classwide discrimination. Sperry Rand Corp. v. Larson, 554 F.2d 868, 872 (8th Cir. 1977); Swint v. Pullman-Standard, 539 F.2d 77, 93 & n.36 (5th Cir. 1976) (cases cited).
 
 
 29
 Finally, appellants Kirby and Nelson argue forcefully that they were discriminated against as individuals because they were laid off for longer periods than Stone, a white employee with less seniority. As discussed above, Stone as the tenon machine off-bearer could work during plant shutdowns when other employees were laid off. However, as the district court found, Stone's promotion to tenon machine off-bearer was the result of racially discriminatory practices against Nelson and Kirby. Therefore, to the extent the district court compensated Kirby and Nelson for Stone's discriminatory promotion, it should also have compensated them for another vestige of the same discrimination, the fact that Stone as tenon machine off-bearer had more job security during layoffs.
 
 
 30
 In conclusion, we find that the district court erred in failing to certify the class for the purposes of monetary relief. On remand the district court should so certify and award the following classwide relief: (1) necessary injunctive procedures to remedy the existing discriminatory promotional policies; and (2) classwide back pay to all class members, including the named plaintiffs, for lost promotional opportunities. If the evidence supports a finding of classwide discrimination, the court should award classwide back pay for appellee's failure to give the customary post-probationary period pay raise. Further, using the standard articulated in Griggs v. Duke Power Co., supra, 401 U.S. at 432, 91 S.Ct. 849, I. e., whether there were racially discriminatory consequences, the court should ascertain whether appellee's use of the leadman classification constituted classwide discrimination and warranted classwide relief. The court should also award appellants Kirby and Nelson monetary compensation for the discriminatory layoff time.
 
 
 31
 Numerous courts have addressed the problems inherent in awarding classwide back pay in employment discrimination cases. We note that subclasses are appropriate, Fed.R.Civ.P. 23(c)(4); E. g., United States v. United States Steel Corp., supra, 520 F.2d at 1051, and that it is the responsibility of each class member to show he is entitled to the back pay, E. g., Stewart v. General Motors Corp., supra, 542 F.2d at 452, 453. The district court should follow the additional guidelines set forth in Stewart, supra, for awarding back pay. Wells v. Meyer's Bakery, supra, 561 F.2d at 1273.
 
 
 32
 Accordingly, the judgment is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.
 
 
 33
 GIBSON, Chief Judge, concurring in part and dissenting in part.
 
 
 34
 I concur in the result reached by the majority except on the issue of whether the use of the leadman classification constituted classwide discrimination. The two-day trial in the district court revealed a lack of evidentiary support for appellants' argument that the classification was merely a device to enable Colony to pay higher wages to whites. Appellants simply failed to meet their burden of proof in the court below. Appellants failed to establish a prima facie case of employment discrimination under a disparate impact theory because the statistical evidence was ambiguous and they failed to meet their burden of proof under a disparate treatment theory because they did not prove that higher wages for leadmen were not justified by virtue of supervisory responsibilities or other special circumstances. Because of this lack of proof relating to the leadman claim, the burden did not switch to the appellee to show that the use of the leadman classification was justified by business necessity. Thus, the record contains substantial evidentiary support for the District Court's disposition of this issue, which we should not retry.
 
 
 35
 The District Court concluded that "the use of the 'leadman' and 'leadwoman' classification has not resulted in any observable discrimination." The record reveals that there were eleven leadmen positions, seven of which were filled by whites and four filled by blacks. One of these positions was filled by Johnson, who is white. Because of the special circumstances involved in his classification it would not be appropriate to consider him in determining whether the policies and practices of selecting leadmen had a discriminatory result. See ante at 704-705. Thus, the District Court concluded that the statistics did not sufficiently evidence discrimination. Employers should have and traditionally have had a right to structure their work force. The courts are ill-suited to direct a business operation.
 
 
 36
 Furthermore, appellants practically conceded in their brief (appellants' brief p. 22) that the evidence of whether leadmen performed supervisory functions was contradictory in all cases except concerning Johnson. As Judge McMillian explains, Ante at 704-705, Johnson had exceptional skills and is unsuitable as an example of appellants' argument. Resolving contradictory evidence is a function delegated to the trier of fact, in this case the District Court.
 
 
 37
 Since appellants' argument rests upon the assumptions that leadmen are white and do not exercise supervisory functions, and the record reveals a lack of evidentiary support for these assumptions, I do not feel that the District Court's conclusion that the use of the classification does not constitute racial discrimination can be considered clearly erroneous. Thus it is inappropriate to remand this issue to the District Court for further consideration.
 
 
 
 *
 The Honorable Floyd R. Gibson was Chief Judge at the time this case was argued and submitted. Effective January 1, 1980, Judge Gibson took senior status
 
 
 [1]
 Prior to oral argument, Theresa Kirby, Special Administratrix, was substituted for appellant William Kirby. For the sake of convenience, however, we will continue to refer to William Kirby as one of the appellants
 
 
 [2]
 These percentages were calculated on the basis of the figures in plaintiff's Exhibits # 7, 14. Appellants included leadmen, foremen, the assistant manager, and the plant superintendent as supervisory employees. If leadmen are not included among supervisory employees, the percentage of black supervisory employees drops to 18% (2 of 11 employees)
 As discussed in the text Infra, there is considerable controversy as to whether leadmen can appropriately be classified as supervisory or management employees. The district court did not include leadmen on its list of supervisory employees; the district court listed as supervisory only "the general manager, the plant superintendent, the sales manager, the maintenance superintendent, and foremen." Appendix, vol. 1, at 26-27. It is unclear from the district court's memorandum opinion whether any of these supervisory employees, other than the plant superintendent, is black. There is evidence in the record that only one of nine foremen and none of the salesmen or manufacturer's representatives is black. Thus, using the district court's list of supervisory employees, the percentage of black employees may be as low as 15% (2 of 13 employees).
 Because the exclusion of leadmen from the group of supervisory employees, however defined, can only decrease the percentage of black supervisory employees, thus increasing the already substantial statistical disparity between the percentage of black employees in the workforce (80%) and the percentage of black supervisory employees (27% Or 18% Or 15%), appellants have clearly established a prima facie case of discrimination in the selection of supervisory employees. Whether leadmen are supervisory employees is a different but related question. We shall address that question in the discussion of appellants' attack on the leadman classification Infra. The district court did not reach the question whether leadmen are supervisory employees because it found no discrimination in the selection of supervisory employees.
 
 
 [3]
 The average length of time black supervisors had been with Colony was 7.4 years; the average length of time white supervisors had been with Colony was 3.95 years
 
 
 [4]
 The average pay for black supervisors was $129.60 per week; the average pay for white supervisors was $160.70 per week
 
 
 [5]
 The exact nature of this "burden of proof" is unclear. The burden of producing evidence on the issue of business justification is clearly on the Title VII defendant. Griggs v. Duke Power Co., supra, 401 U.S. at 432, 91 S.Ct. 849. I would argue that the Title VII defendant has the burden of persuasion on this issue as well. Id.; Dothard v. Rawlinson, supra, 433 U.S. at 329, 97 S.Ct. 2720. I would distinguish between the Title VII defendant's attempt to show business justification, which seems to me to be analogous to an affirmative defense, and the Title VII defendant's attempt to rebut the inference of discrimination raised by the statistical or other evidence which constituted a prima facie case under a disparate Impact theory by attacking that evidence. See Hazelwood School Dist. v. United States, 433 U.S. 299, 307-10, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); Id. at 316-19, 97 S.Ct. 2736 (Stevens, J., dissenting); Dothard v. Rawlinson, supra, 433 U.S. at 329, 97 S.Ct. 2720. My view of the nature of the "burden of proof" is not necessarily shared by Judge Gibson and Judge Ross
 
 
 [6]
 We note that the proper standard for determining whether "business necessity" justifies a practice which has a racially discriminatory result is not whether it is justified by routine business considerations but whether there is a Compelling need for the employer to maintain that practice and whether the employer can prove there is No alternative to the challenged practice. United States v. St. Louis-S.F. Ry., 464 F.2d 301, 308 (8th Cir. 1972) (en banc) (emphasis added), Cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973)