583 F.Supp. 191 (1984)
Arlene SCOTT, Plaintiff,
v.
The COCA-COLA BOTTLING COMPANY OF ST. LOUIS, INC., Defendant.
No. 82-997C(3).
United States District Court, E.D. Missouri, E.D.
February 29, 1984.
*192 *193 Kenneth K. Vuylsteke, St. Louis, Mo., for plaintiff.
Ross A. Friedman, St. Louis, Mo., for defendant.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court after a nonjury trial on November 21 and 22, 1983. At the conclusion of the evidence, the Court found the issues in defendant's favor and against plaintiff, and the parties were given time to file post-trial submissions.
Plaintiff, a black female, initiated this action by filing a pro se complaint charging defendant with discrimination as evidenced by her allegedly racially-motivated discharge from her position as a sales clerk with defendant. Counsel was appointed and filed an amended complaint invoking the Court's jurisdiction under 42 U.S.C. § 2000e, et seq. (Title VII), and 42 U.S.C. § 1981. Plaintiff has complied with the jurisdictional prerequisites set forth in Title VII; her action was initiated within ninety days of the notice of her right to sue by the Equal Employment Opportunity Commission (EEOC). The EEOC had determined, after a full hearing, that there was no reason to credit plaintiff's charge of racial discrimination.

Findings of Fact
1. Defendant, The Coca-Cola Bottling Company of St. Louis, Inc., was at all times material herein a Missouri corporation with its principal office and place of business in Maryland Heights, Missouri. Defendant is engaged in the manufacture, sale, and distribution of Coca-Cola brandname soft drinks and allied products. Defendant employs more than fifteen employees.
2. Plaintiff, a black female, was hired by defendant on May 18, 1978, as a checker. She subsequently assumed the position of cashier, where she handled money and was never accused of dishonesty. On February 1, 1979, plaintiff was transferred to the position of secretary/clerk to distribution manager Tom Yerkes, a white male. On August 4, 1980, pursuant to a company-wide reorganization, plaintiff was moved to a clerk position in the newly-formed marketing department. Plaintiff was earning $4.75 per hour at the time of her termination on August 14, 1980.
3. A white female by the name of Jackie Ferguson served as the confidential secretary to the white vice-president of distribution, Harry Clayton. She possesses shorthand, dictation, and typing skills, and she trained plaintiff upon entry into the department. While serving as secretary/clerk in the distribution department, plaintiff performed basic clerical work. Her duties included answering the telephone, light typing, and preparation of the daily dispatch report. The daily dispatch report was a handwritten summary of information taken from drivers' timecards, route sheets, and sales reports. The report showed the number of cases dispatched and delivered, hours worked, miles driven, and percent of returns. Responsibility for a mileage report was taken away from plaintiff sometime during 1982 because of her inability timely and accurately to complete the report.
4. Due to plaintiff's lack of secretarial and clerical skills, Clayton suggested that she enroll in a secretarial skills course under the company's tuition program. On April 4, 1980, plaintiff enrolled in the professional business school for a nineteen-week office skills secretarial course which cost the company $731.50. On April 28, 1980, plaintiff signed a contract for a ten-week supplemental shorthand course which *194 cost the company $185.20. Plaintiff attended the office skills course from around April 14, 1980, until her discharge. She did not complete the course and had dropped the shorthand course after approximately four lessons.
5. During the period of April 14, 1980, through August 14, 1980, the plaintiff was absent from school eight days during a thirty-day period. She was given a suspension letter on July 2, 1980, after three consecutive unexcused absences. She was counseled by school director Richard Gans about her attendance and performance. The suspension letter was copied to Tom "Yourkis." Plaintiff received Mr. Yerkes' mail on a daily basis, and he did not receive the letter; nor did plaintiff advise the company that she had received the suspension letter and had dropped the shorthand course.
6. On August 4, 1980, the distribution department was merged into the sales department, which then became known as the marketing department. The reorganization was prompted in part by Clayton's departure and the desire to eliminate a dual system of supervision and personnel. Yerkes had his position eliminated and was reduced to a territory manager with substantially less responsibility. Plaintiff and Ferguson were both transferred to the marketing department, where Ferguson became confidential secretary to Morris Strickland and plaintiff joined receptionist Sue Conrad and sales clerks Judy Campbell and Judy Gherardini under the supervision of office manager Sharon Standish. With the exception of plaintiff, all these women are white. On July 30, 1980, Ms. Gherardini gave two weeks' written notice and terminated her employment on August 12, 1980.
7. Plaintiff was absent on August 4 and returned to work on August 5, 1980. Standish and vice-president of marketing, John L. Nau, III, met with the office employees around August 5, 1980, and discussed the reorganization. Plaintiff was advised that she would be responsible for answering the telephones, light typing, and preparation of the daily sales report.
8. The daily sales report is a recap of the previous day's sales activity and is a basic clerical report. The report was to be completed for company officials around 10:00 a.m. each day. It normally took no longer than one and one-half hours to prepare. The report did not differ in difficulty from the daily dispatch report. Plaintiff was only required to take information from other computer sheets and reports, copy numbers, and compute percentages.
9. Judy Gherardini spent several days assisting plaintiff in the preparation of the daily sales report. By August 12, 1980, plaintiff was still unable to prepare the report satisfactorily, and she approached Standish about her difficulties in her new job. On that date, Standish and plaintiff sat down and worked together on the report. Plaintiff told Standish that she had an understanding of the report and how to prepare it.
10. Plaintiff's telephone abilities on her new job were not satisfactory. Telephone messages needed to be precise, but plaintiff did not always get sufficient information. Nau spoke to plaintiff about the problem and plaintiff said she would try to do better; however, she did not improve substantially during her tenure with the marketing department. Plaintiff's typing skills were also unsatisfactory.
11. On August 13, 1980, plaintiff called in sick and was absent from her position. Plaintiff spoke with Ferguson and stated that she had a headache due to her job.
12. Standish reported plaintiff's absence to Nau and also complained of plaintiff's inability to do the job as well as her absenteeism. Standish had complained previously of plaintiff's work performance. On this occasion, Nau directed Standish to call the professional business school to ascertain plaintiff's progress.
13. Standish spoke with school director Richard Gans who reported that plaintiff had been suspended for absenteeism, that her attendance was "fair," and that he *195 thought she would graduate if she made up the lost time and increased her typing skills. He also related that plaintiff had dropped the shorthand course after four lessons. Gans stated he would check with her teacher and get back with more information, and he would forward a copy of the suspension letter. Standish advised John Nau of the information she had received from Gans. She also contacted Yerkes who stated that he had not seen any letter of suspension.
14. Plaintiff reported to work on time on August 14, 1980, and began the sales report. She again had trouble with the report and Standish subsequently assigned it to someone else for completion, and sent plaintiff to assist Ferguson. Standish received a telephone call from Gans who advised that he had discussed Scott's progress with her teacher and had follow-up information. The teacher had advised that she spent time working with the plaintiff, but that plaintiff's comprehension level was not high. Standish reported back to Nau with this information.
15. On August 14, 1980, John Nau called the plaintiff into his office and terminated her employment in Standish's presence. Plaintiff was told that the company had been advised of her suspension from the school and asked whether she had intercepted the suspension letter to Yerkes, which she denied. Nau stated that her work performance and attendance record were poor, and further stated his conclusion that she had in fact intercepted the suspension letter. Nau concluded that there was a serious breach of trust due to plaintiff's interception of the letter and dropping of the shorthand course without so advising the company. Plaintiff was given three weeks' severance pay. No one was hired to replace plaintiff.
16. The company terminated various other managerial and clerical employees, including non-minority employees, during the year preceding plaintiff's termination.
17. Prior to her termination, plaintiff had no statements in her file alleging poor job performance or breach of loyalty.
18. Plaintiff was unable to perform her new job in a satisfactory manner.

Conclusions of Law
1. In a Title VII cause of action, the plaintiff has the initial burden of establishing a prima facie case of discrimination. If the plaintiff is successful, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for the action. If defendant is successful, the plaintiff must be afforded an opportunity to show that the defendant's explanation is merely a pretext for discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973).
2. The principles on the order and allocation of proof outlined in McDonnell Douglas Corp. v. Green, id., are also applicable to an action brought under 42 U.S.C. § 1981. Person v. J.S. Alberici Construction Co., Inc., 640 F.2d 916, 918 (8th Cir. 1981).
3. The requirements for establishing a prima facie case of discrimination in this situation are listed in Boner v. Board of Commissioners of Little Rock, 674 F.2d 693, 696 (8th Cir.1982):
In the usual case, a prima facie case of discriminatory discharge is established by the plaintiff showing that the plaintiff (1) was a member of a protected class, (2) was capable of performing the job, and (3) was discharged from the job. See Johnson v. Bunny Bread Co., 646 F.2d 1250, 1253 (8th Cir.1981), citing Osborne v. Cleland, 620 F.2d 195, 198 (8th Cir. 1980).
Bad faith is not necessarily an issue under Title VII. Kirby v. Colony Furniture Co., Inc., 613 F.2d 696, 702 (8th Cir.1980). While discriminatory motive is critical in a disparate treatment claim, it is not required in a disparate impact theory of discrimination. Id. Either theory may be applied to a given set of facts. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 336 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).
*196 4. Plaintiff has failed to establish a prima facie case of discrimination under either theory of recovery. Plaintiff was not qualified to perform the new duties to which she was assigned as a result of the creation of the marketing department, and her old position was no longer available. Plaintiff introduced no evidence suggesting that any white person was treated differently under similar circumstances or that the creation of the new department operated discriminatorily against blacks. See, i.e., Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (employment practice which operates to exclude blacks and which cannot be shown to be related to job performance is prohibited).
5. The Court rejects plaintiff's apparent contention that she received inadequate training for her new position. Failure to train adequately, absent a showing that the failure constituted either dissimilar treatment from the training whites received or treatment similar on its face but dissimilar in its effects upon blacks and unrelated to business necessity, does not establish liability. See Long v. Ford Motor Co., 496 F.2d 500, 505 (6th Cir.1974). A person who is not qualified for a position, but would instead require training, does not satisfy all the elements required to establish a prima facie case. See Pacheco v. Advertisers Lithographing, Inc., 657 F.2d 191, 193 (8th Cir.1981).
6. Even assuming that plaintiff had established a prima facie case of discriminatory discharge, the case was rebutted by defendant's articulation of a legitimate nondiscriminatory reason for its action. Defendant's evidence showed that, subsequent to the merger of the two departments involved into the newly created marketing department, there was a reduced need for personnel, and there did not appear to be a position for which a person of plaintiff's limited skills was qualified. After she was discharged, her work was assumed by other members of the department; there was no need to replace her.
7. Plaintiff made no showing that defendant's asserted justification was pretextual, nor is there a basis to support any such argument. In fact, by paying her tuition at the professional business school, defendant provided plaintiff with the opportunity to increase her secretarial skills in order to improve her opportunities for continued employment at the company.
8. An award of attorney's fees to defendant is not justified. In order to assess attorney's fees in this situation, the Court must find that plaintiff's claim "was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 423, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978). Or, attorney's fees may be charged if a claim is brought or continued in bad faith. Id. Although plaintiff was unable to establish a prima facie case, the evidence presented, while weak, was sufficient for the purpose of conceivably influencing plaintiff to believe she had a stronger case. See Bowers v. Kraft Foods Corp., 606 F.2d 816, 818 (8th Cir.1979).

JUDGMENT
Findings of fact and conclusions of law dated this day are hereby incorporated into and made a part of this judgment.
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment be and the same is entered in defendant's favor and against plaintiff, and that defendant recover its costs of action from plaintiff.